1:26 MJ 4018

# AFFIDAVIT IN SUPPORT OF
## A CRIMINAL COMPLAINT

I, Lane DeBellis, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and I have been since April of 2022. As a Special Agent, I am authorized by law or by a government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws. Currently, I am assigned to the Joint Terrorism Task Force at the FBI's Cleveland Field Office. I previously served for three years as a criminal prosecutor for the state of North Carolina. I have requested and obtained a number of applications for arrest and search warrants in furtherance of investigations into various types of federal violations. Along with my law school education, I also have training and experience in interviewing and interrogation techniques, arrest procedures, search and seizure, search warrant applications, and various other criminal and law enforcement techniques.

2.      This affidavit is being submitted for the limited purpose of establishing probable cause to believe that ANTHONEY WOJCIECHOWSKI (hereafter referred to as "WOJCIECHOWSKI"), date of birth March 4, 2006, has received and possessed child pornography, committed the sexual exploitation of a child, and transferred obscene material to a minor below the age of 16, in violation of 18 U.S.C. §§ 1470, 2251(a), 2252(a)(2), and 2252A(a)(5)(B).

3.      The statements in this affidavit are based in part on information and evidence provided by the analysis of law enforcement databases, evidence obtained in other state and federal criminal investigations, written reports about this case, examination of records from commercial and FBI databases, grand jury subpoenas, search warrants, child pornography found

on WOJCIECHOWSKI's electronic device, WOJCIECHOWSKI's statements during an interview, and my investigation of this matter. Since this affidavit is being submitted for the limited purpose of securing a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the requested complaint.

## STATUTORY AUTHORITY

4.     This investigation concerns alleged violations of 18 U.S.C. §§ 1470, 2251(a), 2252(a)(2), and 2252A(a)(5)(B).

a. 18 U.S.C. § 1470 prohibits knowingly using the mail or any facility or means of interstate or foreign commerce to transfer obscene matter to another individual who has not attained the age of 16 years, knowing that such other individual has not attained the age of 16 years.

b. 18 U.S.C. § 2251 prohibits any person from using, persuading, inducing, enticing, or coercing any minor to engage in sexually explicit activity for the purpose of producing any visual depiction of such conduct, and the visual depiction must be actually transported in interstate or foreign commerce, or mailed, or the person must know or have reason to know that it will be so transported, or the visual depiction must be produced using materials that have been mailed, shipped, or transported in interstate or foreign comer by any means, including by computer.

c. 18 U.S.C. § 2252(a)(2) prohibits knowingly receiving or distributing, any visual depiction of a minor engaging in sexually explicit conduct, using the mail or any facility of interstate or foreign commerce.

d.  18 U.S.C. § 2252A(a)(5)(B) prohibits the knowing possession or access with intent to view child pornography that has been mailed or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## **DEFINITIONS**

5.  The following definitions apply to this Affidavit:

a.  "Child Erotica" means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily, in and of themselves, obscene or that do not necessarily depict minors in sexually explicit poses or positions.

b.  "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involves the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. See 18 U.S.C. § 2256(8).

c.  "Child Sexual Abuse Material" ("CSAM") has the same meaning as "child pornography."

d.  "Computer" refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions and

includes any data storage facility or communications facility directly related to or operating in conjunction with such device." See 18 U.S.C. § 1030(e)(1).

e.  "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

f.  "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or

"booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

g. "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

h. "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i. "Mobile computing devices," are handheld electronic devices used for storing data (such as names, addresses, music, photographs, appointments, or notes) and utilizing computer programs. Some mobile computers also function as wireless communication devices and are used to access the Internet and send and receive e-mail. Mobile computers often include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Many users of these devices also use cloud storage applications to store data such as images and videos in order to back up data, duplicate data in order to access data from other devices, or to free up space on their device. Most mobile computers run computer software, giving them many of the same capabilities as personal computers. For example, mobile computer users can work with word-processing documents, spreadsheets, presentations, internet browsing and chat

applications. Mobile computers may also include global positioning system ("GPS") technology for determining the location of the device. Mobile computing devices include, but are not limited to, laptops, tablets, and smartphones. This type of device has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and a mobile computer. As the amount of data that people store on their mobile devices has increased, smartphones and other mobile computing devices are also commonly synched with, or connected to, a desktop or laptop computer for backup data storage. This allows users to access selected data, such as photos, emails, contacts, and documents, across multiple devices, or to recover this data if their mobile device is broken or lost.

j.   A "wireless telephone" (or mobile telephone, cellular telephone, or smartphone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information

from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

k.  "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet.

l.  "Minor" means any person under the age of 18 years. See 18 U.S.C. § 2256(1).

m.  "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

n.  The terms "records," "documents," and "materials" include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies); mechanical form (including, but not limited to, phonograph records, printing, typing); or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, or electronic notebooks,

as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

## BACKGROUND REGARDING INVESTIGATIONS INTO CHILD SEXUAL ABUSE MATERIALS AND RELATED OFFENSES

6.      Based on my investigative experience related to child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who utilize the internet to view and receive images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals, including the following:

    a.   Individuals who have a sexual interest in children or images of children may receive sexual gratification, stimulation, and satisfaction from contact with children, or from fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media, or from literature describing such activity.

    b.   Individuals who have a sexual interest in children or images of children may collect sexually explicit or suggestive materials, in a variety of media, including photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual media. Individuals who have a sexual interest in children or images of children oftentimes use these materials for their own sexual arousal and gratification. Further, they may use these materials to lower the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

    c.   Individuals who have a sexual interest in children or images of children frequently maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

    d.   Likewise, individuals who have a sexual interest in children or images of children often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer or cellphone, and surrounding area. These collections are often maintained for several years and are kept close by, usually at the collector's residence, or in online storage, email accounts or

other online communication accounts, to enable the individual to view the collection, which is valued highly.

   e.  Individuals who have a sexual interest in children or images of children also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/collectors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography. This data is typically in digital format, and often maintained on computers, cell phones and in online storage, email accounts or other online communication accounts.

   f.  Individuals who would have knowledge on how to distribute and receive digital images of child pornography through the use of Peer to Peer networks and other online methods would have gained knowledge of its location through online communication with others of similar interest. Other forums, such as bulletin boards, newsgroups, IRC chat or chat rooms have forums dedicated to the trafficking of child pornography images. Individuals who utilize these types of forums are considered more advanced users and therefore more experienced in acquiring a collection of child pornography images.

   g.  Individuals who have a sexual interest in children or images of children prefer not to be without their child pornography for any prolonged time period. This behavior has been consistently documented by law enforcement officers involved in the investigation of child pornography.

7.  Based on my investigating experience related to computer and internet related child pornography investigations, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned the following:

   a.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized. It has also revolutionized the way in which child pornography collectors interact with each other. Child pornography formerly was produced using cameras and film (either still photography or movies.) The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contact, mailings, and telephone calls. Any reimbursement would follow these same paths.

   b.  The development of computers, smartphones and the internet have added to the methods used by child pornography collectors to interact with and sexually exploit children. Computers, smartphones and the internet serve four functions in

connection with child pornography. These are production, communication, distribution, and storage.

c.  Mobile devices such as laptop computers, smartphones, iPods, iPads and digital media storage devices are known to be used and stored in vehicles, on persons or other areas outside of the residence.

d.  Smartphones have the capability to access the Internet and store information, such as videos and images. As a result, an individual using a smartphone can send, receive, and store files, including child pornography, without accessing a personal computer or laptop. An individual using a smartphone can also easily plug the device into a computer, via a USB cable, and transfer data files from one digital device to another. Many people generally carry their smartphone on their person.

e.  Child pornographers can now transfer photographs from a camera onto a computer-readable format. With the advent of digital cameras, the images can now be transferred directly onto a computer. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world. The ability to produce child pornography easily, reproduce it inexpensively, and market it anonymously (through electronic communications) has drastically changed the method of distribution and receipt of child pornography.

f.  Child pornography can be transferred via electronic mail or through file transfer protocols (FTP) to anyone with access to a computer and modem. Because of the proliferation of commercial services that provide electronic mail service, chat services (i.e., "Instant Messaging"), easy access to the Internet, and online file sharing and storage, the computer is a preferred method of distribution and receipt of child pornographic materials.

g.  The Internet and its World Wide Web afford collectors of child pornography several different venues for obtaining, viewing, and trading child pornography in a relatively secure and anonymous fashion. Collectors and distributors of child pornography use online resources to retrieve and store child pornography, including services offered by Internet Portals such as AOL Inc., Yahoo, and Google, Inc., Facebook, Dropbox, Instagram, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services, file exchange services, messaging services, as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Email accounts, online storage accounts, and other online communication accounts allow users to save significant amounts of data, including email, images, videos, and other files. The data is maintained on the servers of the providers and is occasionally retained by the providers after the user deletes the data from their account.

h.  In my recent investigative experience, as well as recent discussions with law enforcement officers, I know that individuals who collect child pornography are using email accounts, online storage accounts, and other online communications

accounts to obtain, store, maintain, and trade child pornography with growing frequency, in addition to, or as an alternative to, the use of personal devices.

i.    Based on traits shared by collectors, the use of email, online storage accounts, and other online communication accounts, and the increased storage capacity of computers and server space over time, there exists a fair probability that evidence regarding the distribution, receipt and possession of child pornography will be found in the TARGET REPORTS notwithstanding the passage of time.

j.    In addition, computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little to no cost. Even when such files have been deleted, they may be recoverable months or years later using readily available forensic tools.

k.    When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space for long periods of time before they are overwritten.

l.    In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.

m.    The storage capacity of personal computers has increased dramatically over the last few years. Common and commercially available hard drives are now capable of storing over 500 GB of data. With that amount of storage space, an individual could store thousands of video files and/or hundreds of thousands of image files.

n.    Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Since the storage capacity of hard drives has increased dramatically over the last several years, it is more likely that the above-described information will be recovered during forensic analysis.

## **NCMEC CYBERTIPLINE**

8.    The National Center for Missing and Exploited Children ("NCMEC") is a private, nonprofit organization primarily funded by the Department of Justice. NCMEC acts as an information clearinghouse and resource for parents, children, law enforcement agencies, schools,

and communities to assist in locating missing children and to raise public awareness about ways to prevent child abduction, and child sexual abuse.

9.      NCMEC receives complaints via their CyberTipline from Internet Service Providers ("ISPs"), Electronic Service Providers ("ESPs"), and others. These CyberTipline reports are reviewed by a NCMEC analyst and forwarded to law enforcement for further investigation on the information provided in the CyberTipline report.

## BACKGROUND OF THE INVESTIGATION

10.      As set forth more fully below, ANTHONY WOJCIECHOWSKI ("WOJCIECHOWSKI") used the Instagram accounts "lg3_psycho2" and "higkbhkh46" and TikTok account "agoyspoliticsoftruth" to send content in violation of the Target Offenses.

## INSTAGRAM

11.      On or about April 1, 2022, NCMEC received a tip, 121377930, from Instagram that account "lg3_psycho2," UID: 50735435140, sent a video in a direct message that Instagram classified as child pornography.  While Instagram did not review the material, the hash value[1] associated with the video matched that of a file that at least one employee or contractor at Meta[2] has viewed in the past and determined that it contained apparent child pornography. The video was uploaded to Meta's servers on or about March 31, 2022, at 02:21 UTC. Instagram provided the following subscriber information for the account that sent the file: Date of birth ("DOB") 03/04/2006, telephone number +12168776372, and an IP address that resolved back to AT&T Internet in Cleveland, Ohio.

---

[1] An image hash is a unique identifier assigned to an image through an algorithmic process, often referred to as a "digital fingerprint." It allows for the comparison of images to determine if they are identical, as duplicate copies of the same image will have the same hash value.
[2] Instagram is owned and operated by Meta Platforms, Inc.

12.     On January 5, 2026, pursuant to a Federal Search Warrant out of the Northern District of Ohio, NCMEC provided the file that Instagram reported to NCMEC as child pornography in tip 121377930. The file consists of a 23 second long black and white video that depicts a nude male penetrating a white female from behind. The female has a slender build and lacks any body hair. She is face down on a bed wearing striped socks that go up to her upper thighs, with a shirt or dress pushed up to show her nude buttocks region.

13.     On or about April 17, 2023, NCMEC received a tip, 160497062, that Instagram account "higkbhkh46," UID: 56447499234, sent a video in a direct message that Instagram classified as child pornography. NCMEC classified the content as "A1," which means the content includes a prepubescent minor engaged in a sex act, defined in the report as "any imagery depicting sexual intercourse (including genital-genital, oral-genital, anal-genital, or oral-anal whether between persons of the same or opposite sex), bestiality, masturbation, sadistic or masochistic abuse, degradation, or any such depiction of the above that lacks serious literary, artistic, political, or scientific value." The video was uploaded to Meta's servers on April 14, 2023, at 02:31 UTC. Instagram provided the following subscriber information for the account that sent the file: DOB 03/04/2006, telephone number +12166876372, and an IP address that resolves back to AT&T Internet in Cleveland, Ohio.  The report provided customer information for the phone number, which was listed as being owned by "Anthony Lgpsycho 6501 Orchard Grove Ave Cleveland, OH 44144."

14.     On December 15, 2025, Instagram provided content related to the "higkbhkh46" account pursuant to a Federal Search Warrant out of the Northern District of Ohio. The content provided did not include the video reported to NCMEC as CSAM, but did include chat transcripts between "higkbhkh46" and another Instagram user. These chats surround the video

marked as child pornography that was reported by NCMEC in tip 16049762. Just prior to "higkbhkh46" sending that video, he stated "Uh someone sent me cp [. . .] He sent me this." Your affiant knows "cp" to be an abbreviation for child pornography. In a later conversation with the same Instagram user, "higkbhkh46" tries to defend himself after someone called him a pedophile, and then says, "I feel like when I turn 18 All thi shit is gunna put me in jail cuz ima legal adult I'm prob gonna end up in jail." Your affiant understands this to mean: 'I feel like when I turn 18, all of this shit is going to put me in jail because I'm a legal adult. I'm probably going to end up in jail.' On a different day, "higkbhkh46" is upset because his favorite online streamer exposed messages he sent. He sends a video of the stream which includes screenshots of those messages where he said "I wanna slap a babies ass so hard till it turns red and she screams with her toothless ass, while she screams I put my dick in her mouth and she's lickin my tip" and "I JUST WANNA RAPE A NEWBORN BABY TILL I CUM IN HER THROAT DROWNING IN MY CUM FUCKING HER DEAD BODY." A few days later, "higkbhkh46" says that he is messaging his teachers and sends a screenshot of a chat to a teacher where he says, "Your ugly as fuck I hope your child dies you pregnant bitch, U faggot bitch, Kill yourself, YOU DUMB WHORE, FUCK YOUR BABY, ILL RAPE YOUR NEWBORN BABY, BITCH." Two days after that, "higkbhkh46" talks about another individual who he says "snitched" on him. User "higkbhkh46" says he "sent him one xp" and then sends "cp." Your affiant believes that "xp" was a typo and "higkbhkh46" corrected it to be "cp" with his subsequent message. User "higkbhkh46" then discusses being afraid of getting caught: "I'm afraid to get caught, Up, The police could get involved bruh" "That happens then idfk anymore I will just kms, Can't investigate my phone if there's no proof of cp. No proof of my dms no proof of nothing." Your affiant understands "idfk" to mean 'I don't fucking know', "kms" as 'kill myself' and "dms" as

"direct messages" which is a reference to messages sent between users in a messaging app such as Instagram. Your affiant believes that this message means, "I'm afraid to get caught. The police could get involved. If that happens, I don't give a fuck anymore, I will just kill myself. They can't investigate my phone if there is no proof of child pornography. No proof of my direct messages. No proof of anything."

15.     On January 5, 2026, pursuant to a search warrant, NCMEC provided the file that Instagram reported to NCMEC as CSAM in tip 160497062. The file consisted of a 30-second-long video that depicts a toddler-aged male straddling a female's legs. He is nude from the waist down and the female is lying face down on the ground. The male child is putting his hands up the female's shorts. He says something to the female that is unintelligible, and she responds affirmatively and pulls her shorts up. He then pushes them up further, crouches down, and grabs his penis, attempting to insert it into the female as the video ends.

16.     In an interview on January 21, 2026, WOJCIECHOWSKI confirmed the "higkbhkh46" account as his.

**TIKTOK**

17.     On or about September 27, 2025, NCMEC received a tip, 220791095, from TikTok regarding account "agoyspoliticsoftruth" associated with email address anthony445edp@outlook.com. TikTok flagged the account for online enticement of children for sexual acts and submitted information regarding the incident to NCMEC. TikTok provided NCMEC the username and email address of the account, as well as a recent IP address from which the account was accessed. The IP address resolved to T-Mobile of Cleveland, Ohio.

18.     Additionally, information from that tip was used to find a related tip, 224153628, submitted on November 23, 2025, in which a mother reported that on September 27, 2025, a

TikTok account "agoyspoliticsoftruth" sent her 13-year-old daughter a photo of his penis and stated "guess im gunna have to fuck your immigrant little coochie and stuff your dead body in my tesla."  Your affiant is aware that "coochie" is slang for "vagina."

19.    On or about December 2, 2025, your affiant reviewed the photo sent by "agoyspoliticsoftruth," the limited chat transcript provided by TikTok, as well as the chats provided by the tipster in 224153628. On January 12, 2025, your affiant reviewed content provided by TikTok pursuant to a federal search warrant issued in the Northern District of Ohio. Based on those records, TikTok user "agoyspoliticsoftruth" conversed with the minor TikTok user MINOR VICTIM 1 ("MV1") in direct messages. They discussed "tcc," which your affiant knows to be an acronym for the true crime community, and "agoyspoliticsoftruth" asked for MV1 to send a picture of herself. MV1 says no and that she is 13 years old. The user of account "agoyspoliticsoftruth" says he/she is 19 years old and goes on to say, "We should be in a dv4d[3] type relationship" and "Hey dv3d fd a 13 y o so why can't l." Your affiant believes this message means, 'Hey, D4vd had sex with a 13-year-old, so why can't I?' User "agoyspoliticsoftruth" says "can I just fuck you gsng" "I know that young coochie tight bae" and sends MV1 a photograph after she says "Pedophille" (sic). Your affiant believes "gsng" is a typo for the word 'gang,' which is likely slang for a way to refer to someone, often a close friend. The image "agoyspoliticsoftruth" sent appears to be a screenshot from a social media group video call between three users. Two of the users do not have their video turned on, their presence instead

---

[3] Your affiant believes this is a reference to the singer "D4vd" who many believe to have been intimately involved with the 14-year-old girl who was found dead in the trunk of D4vd's Tesla in September of 2025. "Dead girl was found in D4vd's Telsa. Now, LAPD describes probe as 'investigation into murder'" *Los Angeles Times,* 24 Nov. 2025, https://latimes.com/california/story/2025-11-24/court-imposes-secrecy-celeste-rivas-death-investigation.

indicated by their male and female avatars. The third user does have their video on, which takes up the top half of the screen. This top half shows what appears to be taken by an adult male lying down, with the camera pointing downwards towards his feet.  His pants are pulled down below the waist and a hand is holding up an erect penis.  User "agoyspoliticsoftruth" follows this up with another image. This image is of a screenshot of a Google images search showing a Shutterstock stock photo of a nude toddler female who is standing in a bathtub. She is leaning over and covering her groin area with her hands. This screenshot was taken while the user was on social media group call, similar to the prior image. User "agoyspoliticsoftruth" then says "why she covering the good parts up??????!!!" He goes on to say "Baby don't ignore me my love," "Please," "Guess I'm gonna have to fuck that immigrant little coochie," "And stuff your dead body in my Tesla."

20.     In an interview on January 21, 2026, WOJCIECHOWSKI admitted that the "agoyspoliticsoftruth" TikTok account was his. He also admitted to sending all of the above messages, including the screenshot of the erect penis. WOJCIECHOWSKI said the penis was not his, but that of his 17-year-old friend's that was shared during a group call. WOJCIECHOWSKI believed that the person he was talking to was a 13-year-old girl and he wanted to shock her with the content he sent. WOJCIECHOWSKI was in his apartment at 1417 East 45th Street, Cleveland, Ohio when he sent the messages. He did not know where the other person was located.

**IDENTIFICATION OF OPERATOR OF ACCOUNTS**

21.     As explained below, there is probable cause to believe that Instagram accounts "lg3_psycho2" and "higkbhk46" as well as TikTok account "agoyspoliticsoftruth" are all operated by ANTHONY WOJCIECHOWSKI.

22.     In August of 2025, the FBI's Counterterrorism Division, Target Discovery Section, Domestic Terrorism Targeting Unit II ("DTTU II") identified chats indicating Telegram display name "Lilpsycho88," username "@vrilcoded," user ID 7818038788 posted a threat to conduct a racially or ethnically motivated violent extremism attack driven by a belief in the superiority of the white race at a specific mosque in Cleveland, Ohio. In this chat, "Lilpsycho88" revealed that he was 19 years old, his first name was "Anthony" and his last name was of Polish origin. At one point he posted a screenshot of an address for an individual that lives in Cleveland, Ohio, and stated that it was a coworker of his. Between his targeting of a mosque in Cleveland, and showing that his coworker resided in Cleveland, DTTU II assessed "Lilpsycho88" as likely Cleveland-based.

23.     In early August of 2025, "Lilpsycho88" posted a screenshot of a TikTok livestream. One of the comments visible in the livestream was posted by TikTok user "vrilcoded1161," who had the same profile picture as "Lilpsycho88." "Lilpsycho88" indicated later in the chat that his TikTok profile was banned. DTTU II identified two TikTok profiles, no longer accessible at the time, that previously used the display name "vrilcoded1161." Those account usernames were "the.dark.passeng8" and "vril.powered.horse.cock."

24.     Due to the nature of the threat against the Cleveland mosque, an emergency disclosure request ("EDR") was sent to TikTok for subscriber information regarding the two usernames above. TikTok provided that both usernames were from the same user who had just changed their username. Additionally, TikTok provided: the signup IP address for the account, resolving to T-Mobile of Cleveland, Ohio; the date of sign up, July 29, 2025; and a Facebook ID that was linked to the account. An EDR was then sent to Facebook for subscriber information from that Facebook ID. Facebook provided subscriber information, including, but not limited to,

recent IP addresses which all resolved to T-Mobile of Cleveland, an email address of anthonywojciechowski224@gmail.com, and a DOB of 03/04/2006.

25.     A court order granted under 18 U.S.C. § 2703(d) to Google, Inc. for the email address anthonywojciechowski224@gmail.com provided five other linked email addresses. A subsequent court order for those accounts identified another account operated by the same individual, anthony445edp@gmail.com. Open source research on that email address revealed a TikTok account with the username "goyofamerica3." In October of 2025, Telegram user "Lilpsycho88," user ID: 7818038788 changed his display and usernames to "Goyofamerica" and "goyofamerica1."

26.     Subsequent open source research revealed that likely there was only one ANTHONY WOJCIECHOWSKI in the state of Ohio. His date of birth matches the date of birth in the above Facebook account. He is 19 years old, with a first name of Anthony, and a Polish last name, which is all consistent with the messages sent by Telegram account "Lilpsycho88." Furthermore, WOJCIECHOWSKI's listed address is in Cleveland, Ohio, and subsequent legal process reveals that he is currently a T-Mobile customer.

27.     Therefore, your affiant believes that Telegram account "Lilpsycho88" is operated by WOJCIECHOWSKI, who utilizes the email address anthony445edp@gmail.com and the usernames of "goyofamerica," "goyofamerica1," and "goyofamerica3." The TikTok account in NCMEC tip 220791095 utilized the username "agoyspoliticsoftruth" and email address anthony445edp@outlook.com, which are similar to WOJCIECHOWSKI's known email address and usernames. Tip 220791095 also provided an IP address for "agoyspoliticsoftruth" which resolves to T-Mobile of Cleveland, Ohio. In records provided by the TikTok search warrant, "agoyspoliticsoftruth" sends several messages that provide information on his identity. There are

multiple chats where the individual that "agoyspoliticsoftruth" is speaking to, refers to him as "Anthony." He also posts a photo of a Starbucks drink that has the name "Anthony" on the label. In comments on posts, "agoyspoliticsoftruth" talks about living in Cleveland, Ohio, and even states "Yo Cleveland Ohio I live downtown near 45th street in a apartment bro come get me dude." On November 10, 2025, your affiant confirmed with the Cuyahoga Metropolitan Housing Authority that WOJCIECHOWSKI's current address is 1417 East 45th Street, Unit 214, Cleveland, Ohio, 44103, where he moved in May of 2025. Based on the investigative activity described above, your affiant believes that the TikTok account listed in NCMEC tips 220791095 and 224153628 is operated by WOJCIECHOWSKI.

28.     In the chat records provided by the Instagram search warrant, "higkbhkh46" sends several messages that provide information on his identity, which is consistent with WOJCIECHOWSKI. Two days after "higkbhkh46" sends the video Instagram flagged as CSAM, "higkbhkh46" threatens to kill himself. He sends a photo of four pill bottles, two of which were prescription bottles with the name "Anthony Wojciechowski." Later on, he sends what he says is his Netflix account email address of "anthonywojciechowski224@gmail.com." A couple of days later, he talks about people online who found his personal information. "Higkbhkh46" sends a screenshot of that information which shows a message sent to him that says, "(rhodes high school cleveland ohio) opens at 8:30 and closes around 2:30-3:00 american eastern time anthony wojciechowski cleveland ohio +1(216) 877-6372." The NCMEC tip regarding this account provided customer information for the phone number associated with subscriber information for "higkbhkh46," which was listed as being owned by "Anthony Lgpsycho 6501 Orchard Grove Ave Cleveland, OH 44144."Open source information reveals that WOJCIECHOWSKI resided at 6501 Orchard Grove Avenue, Cleveland, Ohio, 44144 in 2022

and 2023, and has the date of birth of March 4, 2006, matching the information provided by

Instagram in both of the NCMEC tips and search warrant returns. Based on this information,

there is probable cause to believe that WOJCIECHOWSKI is the owner of the "lg3_psycho2"

and "higkbhkh46" accounts.

29.     While WOJCIECHOWSKI sent the files that prompted the Instagram NCMEC

tips in March of 2022 and April of 2023, your affiant believes that these actions are still relevant

today. In my training and experience, individuals who view, collect, and disseminate CSAM do

not partake in that behavior as one-off instances. Instead, it is something they continue to do,

typically having to create a number of online accounts, as each one gets shut down for violating

the terms of service.

30.     As for WOJCIECHOWSKI, there was over a year between the behavior in

NCMEC tips 121377930 and 160497062—it was not a one-off instance. Throughout the course

of this investigation, your affiant has been able to attribute to a number of different email

addresses and social media accounts to WOJCIECHOWSKI. Many he used for a short period of

time until they get banned, at which time he created another. Additionally, we see in the

information from NCMEC tips 220791095 and 224153628, that as recently as September 27,

2025, WOJCIECHOWSKI was attempting to engage sexually with an individual he knew to be

13 years old. Furthermore, in information provided by Snap Inc. pursuant to a court order, a

Snapchat account attributed to WOJCIECHOWSKI was reported two separate times for

violating the terms of service. On or about January 1, 2025, a user reported media sent by

WOJCIECHOWSKI, stating, "My little 15-year-old sister got a text from him stating he was

going to rape her and laugh about it. He needs to be removed from this platform." On or about

June 12, 2025, a different user reported WOJCIECHOWSKI for what the user described as

"adult threatening to rape a 16 year old."  In chat records provided by TikTok, on September 16, 2025, a TikTok user was threatening to call WOJCIECHOWSKI's workplace and tell them he harasses minors. WOJCIECHOWSKI responds to that message by saying "Don't forget to mention how I fuck them too."

## RESIDENTIAL SEARCH WARRANT

31.    On January 21, 2026, Cleveland FBI executed federal search warrants (1:26mj9015 and 1:26mj9022) on WOJCIECHOWSKI's residence and person.

32.    During the execution of the search warrants, a cursory partial review of evidence was conducted by Computer Analysis and Response Team Senior Digital Forensic Examiner Christina Suther, which was then shared with your affiant. These images were then shown to WOJCIECHOWSKI during the interview.

33.    Contemporaneous to the execution of the search warrants, your affiant interviewed WOJCIECHOWSKI. During the interview, WOJCIECHOWSKI admitted to talking to a girl, MINOR VICTIM 2 ("MV2"), who he knew to be 14 years old. They met online through Snapchat around August of 2025, and they currently talk through Snapchat and iMessage. WOJCIECHOWSKI also speaks to MV2's mother and sister. WOJCIECHOWSKI explained that MV2's mother is aware of their relationship and is fine with it. MV2 lives in Indiana, and they have never met in person. WOJCIECHOWSKI stated that he would have sex with MV2 even though she is 14, if her mother was okay with it.

34.    Based on an initial review of WOJCIECHOWSKI's device, your affiant went through several photos found on the device with him. WOJCIECHOWSKI identified several photos as being of MV2. Many were screenshots that WOJCIECHOWSKI said he took while on a video call with MV2. For example, there is an image that shows the vaginal area of a white

female, with fingers digitally penetrating her vagina. In the top right corner of the screenshot, there is a small thumbnail of WOJCIECHOWSKI's face as he watches MV2 during the video call. WOJCIECHOWSKI appears to be smiling and there are pink animated hearts surrounding his head.

35.     There were other images on WOJCIECHOWSKI's device that were not screenshots from a video call, but he identified as MV2. For example, there is one image that WOJCIECHOWSKI said MV2 sent to him that shows a vape smoking device penetrating MV2's vagina. There is digital red scribbling on the image, but her vaginal area, and the vape partially inside her vagina are still visible. WOJCIECHOWSKI described the image and agreed that it was inherently sexual.

36.     During the interview, WOJCIECHOWSKI admitted that he knew his behavior and relationship with MV1 and MV2 was wrong. He explained that he does what he does online because he wants to kill off all the parts of him that have feelings. WOJCIECHOWSKI also admitted that in 2025 he was planning a mass shooting of a synagogue in Cleveland. He explained that he wrote a two-page manifesto called "The Ethnic Cleansing" where he spoke about wanting to kill several minority groups because he was mad at the world. WOJCIECHOWSKI spoke with people on Telegram about it and even asked for help finding a cheap gun quickly. He ultimately decided not to go forward with the plan but did agree that his impulse control is lacking.

37.     WOJCIECHOWSKI also detailed his history with self-harm. WOJCIECHOWSKI first started cutting himself in 2022 as a way to feel something. During the interview, WOJCIECHOWSKI pulled up his sleeves and showed your affiant numerous cutting scars on both arms. The last time he cut was November of 2025. In 2023, after getting kicked out of his

high school, WOJCIECHOWSKI attempted to die by suicide by taking several different pills. He ended up hospitalized for a couple of weeks and then spent about a week in a mental hospital. He was not provided a mental health diagnosis at that time. More recently, on or about January 4, 2026, WOJCIECHOWSKI tried to die by suicide again, this time taking a large quantity of Benadryl. This attempt was not successful, and WOJCIECHOWSKI decided to move on.

## **CONCLUSION**

38.     Based on the above information, probable cause exists that ANTHONY WOJCIECHOWSKI was violated 18 U.S.C. §§ 1470, 2251(a), 2252(a)(2) and 2252A(a)(5)(B).

Lane DeBellis
Special Agent
Federal Bureau of Investigation

Sworn to via telephone after submission by reliable
electronic means. Crim.Rules. 4.1; 41(d)(3)
this 21st day of January, 2026.

JONATHAN D. GREENBERG
UNITED STATES MAGISTRATE JUDGE

